# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **TERESA T. AFOA** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  CIV-10-658-F** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of the Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Teresa Afoa ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Defendant Commissioner's final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income payments under the Social Security Act.  This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B).  Upon review of the pleadings, the record ("Tr.") and the parties' briefs, the undersigned recommends that the Commissioner's decision be affirmed.

## Administrative Proceedings

Plaintiff initiated these proceedings by protectively filing applications seeking disability insurance benefits and supplemental security income payments in April, 2006 [Tr. 91 - 93, 97 - 99, and 131].  She alleged that "eye problems[1] [and a] hip joint problem" resulted in difficulties with standing or sitting "for prolonged periods of time," right leg

---

[1]Plaintiff abandoned this claim at her administrative hearing [Tr. 35].

numbness with falls, and pain on her entire right side, all of which became disabling as of June 5, 2005 [Tr. 107].[2]  Plaintiff's claims were denied and, at her request, an Administrative Law Judge ("ALJ") conducted an April, 2008 hearing where Plaintiff, who was represented by counsel, and a vocational expert testified [Tr. 22 - 49].  In her May, 2008 decision,  the ALJ found that Plaintiff retained the capacity to perform her past relevant work as a customer service clerk and a telemarketer and, accordingly, was not disabled within the meaning of the Social Security Act [Tr. 11 - 21].  The Appeals Council of the Social Security Administration declined Plaintiff's request for review [Tr. 1 - 5], and Plaintiff subsequently sought review of the Commissioner's final decision in this court.

## Standard of Review

This court is limited in its review of the Commissioner's final decision to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations and quotations omitted).  Nonetheless, while this court can neither reweigh the evidence nor substitute its own judgment for that of the ALJ, the court's review is not superficial.  "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion."  *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted).  "A decision is not based on

---

[2]Unless otherwise indicated, quotations in this report are reproduced verbatim.

substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* at 299.

**Determination of Disability**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§§423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. §§404.1520(b)-(f), 416.920(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail). Under this sequential procedure, Plaintiff bears the initial burden of proving that she has one or more severe impairments. 20 C.F.R. §§ 404.1512, 416.912; *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Then, if Plaintiff makes a prima facie showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Turner*, 754 F.2d at 328; *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).

**Plaintiff's Claims of Error**

Plaintiff maintains, first, that "[t]he Appeals Council erred in its consideration of the new and material evidence submitted after the ALJ's decision." [Doc. No. 21, p. 6]. Next, she contends that "[t]he ALJ's finding that the claimant did not meet or equal a listing of

impairment is legal error and not supported by substantial evidence." *Id.* at 7. Plaintiff's

final claim is that "[t]he ALJ failed to properly evaluate claimant's credibility." *Id.* at 11.

## Analysis

### Evidence Submitted to the Appeals Council

The ALJ found that Plaintiff – who was twenty-nine years old at the time of her

hearing, with a GED and one semester of college, and who last worked in June, 2005 as a

meat packer [Tr. 27 and 34] – was severely impaired, but not disabled, by a right hip

deformity [Tr. 13 and 21].[3] In her initial claim of error, Plaintiff argues that she submitted

additional records to the Appeals Council as part of her challenge to the ALJ's decision, and,

that while the Appeals Council stated that it had considered the proffered documentation, it

concluded that the evidence did not provide a basis for changing the ALJ's decision. *Id.* at

6. According to Plaintiff's argument, "[t]he Appeals Council did not elaborate or explain its

reasons, if any, for rejecting this new and material evidence. This omission is an error of

law." *Id.* Contrary to Plaintiff's contention, it is the law in the Tenth Circuit that "[w]hile

an express analysis of the Appeals Council's determination would have been helpful for

purposes of judicial review, [there is] nothing in the statutes or regulations that would require

such an analysis where the new evidence is submitted and the Appeals Council denies

review." *Martinez v. Barnhart,* 444 F.3d 1201, 1207-8 (10th Cir. 2006). *See also Krauser v.*

---

[3]The ALJ further determined that Plaintiff had a non-severe impairment, bilateral pes
planus [Tr. 13]. Plaintiff has asserted no claim of error on judicial review with respect to the
ALJ's consideration of that impairment [Doc. No. 21].

*Astrue,* _____ F.3d _____, 2011 WL 1718892, at *2 and 3 (10th Cir. 2011). Nonetheless, "[b]ecause the Appeals Council considered [the] treatment records, the records are a part of the administrative record to be considered by this court when evaluating the ALJ's decision for substantial evidence." *Martinez,* 444 F.3d at 1208 (citations, quotations, quotation marks, and brackets omitted). Accordingly, on judicial review this court is required to "consider the entire record, including [the new evidence][4] in conducting our review for substantial evidence on the issues presented." *Id.* Here, those issues are whether the ALJ erred in finding that Plaintiff's hip impairment was not of listing level severity and likewise erred in concluding that Plaintiff's subjective complaints were less than fully credible.[5]

**<u>Objective Medical Evidence of Record</u>**

In 1993, when Plaintiff was fourteen years old with a history of a possible slipped capital femoral epiphysis ("SCFE"),[6] she was examined at Shriners Hospital [Tr.175 - 181].

---

[4]Plaintiff's argument references only a portion of the documentation – Tr. 313 - 318 – which she submitted to the Appeals Council [Doc. No. 21, p. 6]. In accordance with the dictates of *Martinez,* this court will consider all of the submitted evidence [Tr. 5].

[5]Plaintiff, however, makes no argument that the additional evidence submitted to the Appeals Council bears on the issue of whether or not her hip deformity is of listing level severity. Instead, she maintains that "[t]he Appeals Council failed to set forth specific legitimate reasons for discounting and or disregarding evidence of Claimant's hip replacement surgery which *clearly corroborates her complaints of pain* due to her hip deformity." [Doc. No. 21, p. 7, emphasis added]. Thus, Plaintiff's focus is on the impact of the additional evidence on the ALJ's credibility assessment.

[6]"Slipped capital femoral epiphysis (SCFE) is a hip problem that starts if the epiphysis (growing end) of the femur (thigh bone) slips from the ball of the hip joint." http://familydoctor.org/online/famdocen/home/children/parents/special/bone/282.printerview.html.

The examining physicians found that Plaintiff was status post SCFE on the right with fusion of the growth plate; that she had a clinical one inch leg length discrepancy and a resulting limp; that she denied any pain; that surgery was not indicated; that the plan was to provide her with a shoe lift; and, that she was to follow-up in one year or sooner if she had problems. *Id.* The record reflects that a no-show letter was sent one year later [Tr. 179].

The next evidence of medical treatment[7] relating to Plaintiff's hip was generated in April, 2006, some ten months after her alleged onset of disability [Tr. 251].[8] A physician at O.U. Medical Center noted Plaintiff's history of orthopedic problems since childhood; that she walked with a limp and a cane; that her hip flexion was reduced by pain; that her knee extension was reduced by pain; and, that she had positive straight leg testing. *Id.* The physician assessed Plaintiff as a twenty-seven year old obese female with a deformity of the right femoral head/neck which led to pain and difficulty walking; pain control was prescribed and a notation was made for an orthopedic consult. *Id.*

In June, 2006, Plaintiff was seen in O.U. Medical Center's Emergency Department for problems with her skin [Tr. 189]; her past medical history was noted as chronic right hip

---

[7]The record contains a significant number of records dealing with Plaintiff's difficulties with various skin conditions. Except where a skin treatment note contains pertinent history notations or physical examination findings, these records are not discussed because Plaintiff has not asserted error in connection with the ALJ's consideration of that evidence.

[8]Presumably, there are medical records which were generated during this ten month time period. Plaintiff stated in her July, 2006 "Function Report - Adult" that her youngest child was seven months old [Tr. 122]. Accordingly, Plaintiff was pregnant and gave birth during this time period and likely received medical care.

pain,[9] *id.*; she denied any muscle or joint pain [Tr. 190] and, on examination, both her gait and heel to toe testing were normal and her strength was equal bilaterally [Tr. 191]. Plaintiff was admitted five days later for treatment of cellulitis [Tr. 198 - 209]; she stated that her problems with cellulitis had "started approximately two months ago when [she] was cutting the lawn." [Tr. 203].

On August 2, 2006, Plaintiff saw Vu Le, M.D., at the O.U. Medical Center and reported, in addition to her chief complaint of back pain and her history of skin problems, that she had experienced a chronic hip deformity since childhood and had also had an extra toe amputated while a child; she also advised that she was not working due to pain [Tr. 245, 246, and 248]. Her hip deformity was evident on X-ray and she was referred to the orthopedic department with severe pain [Tr. 245 and 248].

Matthew Davis, D.O., saw Plaintiff on August 21, 2006, for a consultative physical examination [Tr. 212 - 218]. Dr. Davis described the history of her present illness in the following manner:

> The patient is a 27-year-old female complaining of right hip pain since, she is unsure, but believes age 12. The patient states she is unsure of the cause, but states she is supposed to have surgery on it. She did not have surgery as a child. Her pain in right hip, especially in her right low back and right hip and thigh. Her pain is described as sharp and constant, rated at 10 out of 10. The patient states she has numbness and pain which result in her having occasional falls. The patient states that she has numbness in the right hip as well. The patient also had a complaint of an eye problem and states that it causes her to have some blurry vision, but she is unsure of what exactly the eye problem is

---

[9]Plaintiff also reported chronic right hip pain when she was seen in the O.U. Medical Center Emergency Department the previous week for skin problems [Tr. 193 - 194].

and states that her eye doctor has not given her any referrals or anything for it, so she is unsure of the cause of the eye problem. The patient is a poor historian. She is not being very forthcoming with information. She states that she has had a neck pain for about six to eight months and then told me that it was actually longer than that. She is unsure of the cause of it. She states that her doctor has been told about that as well, but patient is unsure of a cause.

[Tr. 212]. The doctor noted the following in connection with his physical examination of

Plaintiff:

No muscle spasms appreciated at this time. Muscle bulk is within normal limits. Deep tendon reflexes of biceps, triceps, brachioradialis, patellar and Achilles reflexes are +2/4. Range of motion, back extension is 20/25 due to pain, back flexion 65/90 due to pain, left back lateral flexion 20/25 due to pain, right back lateral flexion is 25/25, neck flexion is 45/50 due to pain, left cervical rotation is 40/80 due to pain, right cervical rotation is 30/80 due to pain, left hip extension is 10/30 due to pain, right hip extension is 5/30 due to pain, left hip flexion is 5/100, right hip flexion is 5/100 due to pain, left and right hip abduction 10/40 due to pain, left hip internal rotation is 30/40 due to habitus, right hip internal rotation is 0/40, left hip external rotation is 45/50 due to habitus, right hip external rotation is 40/50 due to pain, right and left knee flexion 0/150; the patient states she cannot do due to pain, left ankle plantar flexion is 10/40, and right ankle plantar flexion is 10/40 due to pain, left ankle dorsiflexion and right ankle dorsiflexion are both 5/20 due to pain, left shoulder in supination and abduction and on right are both 140/150 due to habitus, left shoulder forward elevation as well as right shoulder forward elevation are both 140/150 due to habitus, left shoulder internal rotation 75/80 due to habitus, right shoulder internal rotation 70/80 due to habitus, left shoulder external rotation 70/90 due to habitus, right shoulder external rotation 65/90 due to habitus, left and right wrist in pronation both 70/80 due to habitus, left wrist and right in supination are both 70/80 due to habitus, left and right thumb flexion of proximal phalange are both 65/70 due to habitus, left and right thumb flexion of distal phalange are both 80/90 due to habitus.

[Tr. 213]. Dr. Davis' observations continued:

The patient states that she cannot manipulate small objects, but when asked, she states that she can button her shirt and she zipped up her jacket for me in the room without any difficulty. The patient states she cannot grasp a hammer. She is able to drink things, but states she cannot hold a cup very

well, but yet she is able to drink and hold a cup. Grip strength is 5/5 and equal. Gait description, speed was somewhat slowed. Gait was safe and stable. The patient was unwilling to walk without her cane. She stated she would fall. The patient would not even attempt it. Heel to toe walk was unable to be assessed as well. The patient would not attempt that as well. She states she would not do it. The patient was able to get up from the chair and get onto the exam table. The patient was somewhat cooperative although she does appear to be guarding. I asked her to relax and let me move some joints and she just continues to tighten muscles up and not allow me to examine them thoroughly. Straight leg raise was negative. The patient does have a need for assistive devices. She states that she has a cane and a walker. The patient states that she is unable to do anything. She just lies around at home all day. . . . Coordination, what could be assessed, was within normal limits; although the exams were very limited due to the patient's effort. . . . There did appear to be some voluntary muscle movements, such as tightening muscles up so I could not assess things well and appeared to be a lack of effort. There did not appear to be any involuntary muscle movements.

[Tr. 213 - 214]. Dr. Davis' sole assessment was "[h]istory of right hip pain." [Tr. 214].

In response to the referrals made by various O.U Medical Center physicians, Plaintiff was seen in the O.U. Medical Center Orthopedic Surgery Clinic in October, 2006 [Tr. 243 - 244]. The examining physician reported that Plaintiff was "very hesitant to let me range her hip. She localizes the pain actually more laterally than in her groin. . . . She does allow you to range her hip when you are rolling it from the knee, but she states it hurts down the lateral aspect of her leg when you do that." [Tr. 243]. Plaintiff was assessed with significant hip pain resulting from her prior SCFE; samples of Celebrex[10] were given and one month of

---

[10]Celebrex is a nonsteroidal anti-inflammatory drug (NSAID) used to treat acute (sudden) pain, menstrual cramps, pain and inflammation due to osteoarthritis, rheumatoid arthritis, and rheumatoid arthritis of the spine (ankylosing spondylitis). http://www.pdrhealth.com/drugs/celebrex.

physical therapy to work on range of motion was prescribed [Tr. 243 - 244].

Plaintiff returned to the Orthopedic Surgery Clinic in January, 2007 [Tr. 239 and 241-242]. She reported bilateral hip pain as well as bilateral lower extremity pain "that has caused her to have giving out in her feet and knees." [Tr. 239 and 241]. The following was noted with respect to the physician's physical examination and assessment:

> Right lower extremity is neurovascularly intact. Left lower extremity is neurovascularly intact. Left foot shows significant pes planus with no focal area of tenderness. She reports pain with any range of motion of her bilateral knees and pain with any range of motion of her bilateral hips. On slow range of motion, she does have full range of motion, internal and external rotation of her bilateral hips. The left not being any worse than the right. She reports some focal tenderness to palpation on the lateral side of her bilateral hips, however, it is focal only to a few cm in diameter.

> * * *

> Patient was seen and evaluated by Dr. Tompkins. At this point it felt like she would not benefit from any surgery to her right hip as her pain is inconsistent as directly related to her right hip. We will give her a prescription for custom mold inserts to her bilateral feet for pes planus. No pain medication prescriptions were given. We will see her in three months in our clinic for evaluation.

*Id.*

Plaintiff presented to the O. U. Medical Center Medicine Clinic on March 7, 2007, with complaints of recurrent skin cellulitis and was admitted for treatment [Tr. 228 - 238]. On her subsequent discharge, Dr. Vu Le stated that "[s]ince the patient has hip deformity, we have instructed the patient to go to Wal-Mart to get cane for herself." [Tr. 232].

A record generated on March 15, 2007, by the O.U. Medical Center Emergency Department reflects that Plaintiff complained of right hip and back pain [Tr. 257]; she was

discharged with the diagnosis of acute/chronic right hip pain with a referral to the Orthopedic Clinic and restrictions to "light duty" for one to two days. *Id.* The records do not indicate that Plaintiff returned to the Orthopedic Clinic before May 14, 2007, where she was described as having a history of right hip pain and "of missing clinic appointments." [Tr. 253]. On physical examination, Plaintiff's "right lower extremity is neurovascularly intact. She demonstrates a slow range of motion secondary to mainly pain, however, it is full range with internal and external rotation as well as extension and flexion." *Id.*

In late August, 2007, Dr. Vu Le of O. U. Medical Center Medicine Clinic completed a Work Tolerance Report in order to assist the Oklahoma Department of Human Services with a work plan for Plaintiff [Tr. 224 - 225]. Dr. Le determined that Plaintiff could lift less than ten pounds, could stand and/or walk with normal breaks using a medically required hand-held assistive device for ambulation; that she could sit, with normal breaks, periodically alternating sitting and standing to relieve pain or discomfort; and, that she could use her hands for both fine and gross manipulation. *Id.* Dr. Le noted that Plaintiff had a congenital right hip deformity that would be with her for life and that "she may need surgical intervention in the future if this problem worsens." [Tr. 225].

Plaintiff was seen in the Mercy Health Center Emergency Room on September 23, 2007, complaining of right hip pain, a recent fall, and a rash [Tr. 260 - 262]. She said that she was in due to the fall "because the hip is bothering her again [and s]he wanted to make sure she did not refracture it, although she is able to ambulate." [Tr. 260]. She was found to be diffusely tender in her right hip area and extending into the gluteal area; she had no focal

11

tenderness; she had a full range of motion of all of her extremities; and, an X-ray showed an old hip fracture [Tr. 261]. It was specifically noted that "[s]he does walk cautiously because it does hurt when she ambulates." *Id.* Upon discharge, she was advised to follow up with her primary care physician "on Monday or Tuesday" and that she should be off work until that follow-up. *Id.*

Plaintiff then went to the O.U. Medical Center Emergency Department on September 26, 2007, stating that she had fallen the day before - September 25th – and that she had landed directly on her left knee [Tr. 265 - 266]. She was diagnosed with a left knee contusion and advised to use a knee immobilizer for two days and to ice and elevate; she was also told to stay off work for two days and to follow up with her primary care physician [Tr. 266].

The next record of treatment is in November, 2007, at the O.U. Medical Center Orthropedic Clinic [Tr. 268 - 269]. Plaintiff advised that she has had significant pain in her right hip since childhood with "no history of an acute injury, just progressive pain." [Tr. 268]. Physical examination showed that her "right lower extremity is neurovascularly intact. She has decreased flexion and internal rotation secondary to pain and is mildly tender to palpation over her greater trochanter." *Id.* She was sent for physical therapy, abduction strengthening, and gait training and was advised to return in three to four months. *Id.*

At a March, 2008, examination at the O.U. Medical Center Orthopedic Surgery Clinic, it was reported that physical therapy and original conservative treatments had failed [Tr. 270]. Physical examination revealed that Plaintiff had "significant ankylosis of her hip with only about 10 -20 degree of flexion and 10-20 degrees of abduction, so this may be pain

related as I did not get to a bony end point with her motion. She has pain with internal and external rotation of her hip joint as well." *Id.* Clinic notes indicate that they "will try to send her to Interventional Radiology for right hip injection with steroid and see if she gets some relief of this." *Id.*

In May, 2008, Plaintiff presented at the Deaconess Hospital Emergency Department complaining of a cough [Tr. 300 - 305]. She reported a history of hip and knee pain as well as arthritis [Tr. 301]. On physical examination, she had no neurological deficits, no extremity tenderness was detected, and she had a full range of motion in all extremities. *Id.*

The following month, Plaintiff was seen in the Integris SW Medical Center Emergency Room complaining of pain after a fall [Tr. 277 - 279]. She stated that she "fell forward onto her left knee and hurt her left knee while falling. She felt a pop in her right hip and complains of pain there." [Tr. 277]. On physical examination she was found to have some tenderness around her right hip [Tr. 278]. She had a fairly good range of motion without any particular pain. *Id.* Her left knee was tender with some swelling and bruising. *Id.* X-rays showed that there was no knee fracture and "reveal[ed] congenital misshaping of the right hip[.]" *Id.* Her discharge diagnosis was a left hip contusion secondary to a fall and right hip strain. *Id.* Plaintiff then returned four days later reporting that she was still having pain despite taking Lortab [Tr. 273 - 276]. On physical examination, she was found to have "pain to the piriformis and parispinal lumbar consistent with sciatica." [Tr. 274]. She was diagnosed with sciatica and advised to follow up with her primary care physician. *Id.*

In September, 2008, Plaintiff walked into the Deaconess Hospital Emergency

Department complaining of chronic right hip pain and of recently developed left hip pain [Tr. 296 - 299]. The nursing notes indicated that she appeared uncomfortable and was unable to ambulate normally due to pain [Tr. 297]. On physical examination, she was noted as appearing comfortable in the room; it was further noted that "though she rates her pain at a 10/10, she is watching TV and eating a lunchables snack tray." *Id.* She had no neurological deficits, no extremity tenderness, and a full range of motion in all extremities. *Id.*

An O.U Medical Center Orthopedic Surgery Clinic progress note shows that on February 9, 2009, Plaintiff was two weeks status post right total hip arthroplasty [Tr. 317 - 318]. She reported pain improvement since her surgery and was ambulating with a walker [Tr. 317]. She was instructed to continue weightbearing as tolerated with a walker on her lower right extremity. *Id.* When Plaintiff returned to the Clinic a month later [Tr. 314 - 316], she was "ambulating still with a walker [and] when . . . asked . . . why, she states it is not so much for the hip, but she has various and sundry other medical complaints including which she says are nerve issues and balance issues and the walker is there to prevent her from falling over." [Tr. 314].

### **Listed Impairment**

The ALJ determined that the severity of Plaintiff's right hip deformity does not meet or equal Listing 1.02 for major dysfunction of a joint [Tr. 17]. Specifically, the ALJ found that "the evidence does not satisfy the criteria concerning the inability to ambulate effectively, as defined in 1.00B2b." *Id.*

Listing 1.02A can be met or equaled if Plaintiff has a major dysfunction of her hip

"resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 1.02A. The regulations generally define the inability to ambulate effectively as the inability to ambulate independently "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* at § 1.00B2b. In this regard, and as the Commissioner's comments on effective ambulation in the Federal Register explain, "[a]n individual who can walk adequately with a cane or other assistive device that affects only one upper extremity cannot be considered as incapable of any gainful activity . . . ." Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed. Reg. 58010, 58010, 58027 (Nov. 19, 2001).

Plaintiff maintains that "[i]t is patently clear that there is uncontroverted objective medical evidence which reveal that the Claimant has met a listing of impairment in this case. It is also clear that the ALJ has failed to adequately and appropriately address this uncontroverted medical evidence." [Doc. No. 21, p. 10]. Nonetheless, Plaintiff fails to point to such evidence. She directs the court to Plaintiff's non-medically-supported statements that she cannot take care of bathing and dressing her three children and needs daily childcare, including help with putting her children to bed. *Id.* at 9. She also takes issue with the ALJ's conclusion that Plaintiff can drive a car and shop, maintaining that the evidence is that she can drive on occasion and must ride in a cart at the store. *Id.* The only medical evidence pertaining to ambulation that is referenced by Plaintiff is a treating physician's opinion that "the Claimant needs a medically required hand held assistive device for ambulation when standing or walking during an eight hour workday." *Id.* at 9. The physician did *not* find that

15

Plaintiff was unable to walk adequately while using her cane and neither did he find upper extremity limitations. Rather, he opined that Plaintiff could lift and/or carry and could "[s]tand and/or walk with normal breaks . . . with a medically required hand-held assistive device for ambulation." [Tr. 224].[11] In other words, he found that Plaintiff required a cane in only one hand to effectively ambulate and found no upper extremity functional restrictions. The ALJ recognized and adopted this finding in her residual functional capacity ("RFC")[12] assessment by determining that "[t]he claimant utilizes a single cane." [Tr. 18]. The ALJ further found that Plaintiff was able "to lift and/or carry twenty pounds occasionally and ten pounds frequently"[13] and "could stand and/or walk for two hours out of an eight-hour workday."[14] *Id.* Thus, the ALJ determined that Plaintiff could walk adequately with a single cane and that she retained her ability to lift or carry.

In *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005), the Tenth Circuit clarified that a court could affirm an ALJ's step three decision when "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." *Id.* at 734. Here, the ALJ's *unchallenged determination* that Plaintiff could lift and/or carry while walking with a single cane establishes that Plaintiff's hip deformity does

---

[11]The treating physician also found that Plaintiff had no limitation in using her hands for either fine or gross manipulation [Tr. 225].

[12]Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[13]*See* Tr. 41 - 42.

[14]Plaintiff has not challenged the limitations assessed by the ALJ [Doc. No. 21].

not result in an inability to ambulate effectively within the meaning of the listing.  Moreover,

Plaintiff has failed to direct the court to any *medical* evidence in the record which could

reasonably support a contrary finding or, in other words, evidence which could persuade a

reasonable factfinder to otherwise conclude.

## Credibility

The ALJ's decision sets out the following findings:

> At her hearing, the claimant testified that she has a deformity in her right hip and must walk with a cane.  She stated the right hip problem has been ongoing since around age thirteen and she might have been born with it or had an accident.  According to the claimant, surgery was offered to her as a teenager, but she was told she might get early arthritis, so she declined the surgery.

> As an adult, the claimant testified she has been seen at the orthopedic clinic at the OU Medical Center.  She testified that hip surgery was denied and she was told she was too young right now for a hip replacement because she would need another by age fifty.  The treating medical records from the orthopedic clinic at the OU Medical Center are silent concerning contemplation of surgery and do not mention a hip replacement.  A steroid injection has been recommended which the claimant described as a "morphine shot in my hip."

> Currently, the claimant is taking Darvocet for pain; however, the claimant did not take her medication the day of the hearing because it makes her sleepy.  The claimant described her hip pain is constant and sharp on a daily basis.  Although her pain medication helps a little, she denied ever having total relief.  The claimant described that she loses feeling in her right leg.  The claimant estimated she can sit forty-five minutes; lift twenty pounds occasionally; and stand and walk about an hour without difficulty.  In a typical day, the claimant described that she needs assistance in getting up in the morning, bathing, and dressing from the waist down.  She testified that she has her neighbor come in and help her get her children ready.[15]  She testified her neighbor is at her home from seven in the morning until they put the children to bed at night.  The

---

[15]Plaintiff testified her children were ages eleven, four, and two on the date of the April 1, 2008, hearing [Tr. 26 - 27].

claimant testified she owns a car, has a valid driver's license and is able to drive. She is able to shop and uses a riding cart at the grocery store.

The claimant confirmed that she does not have any mental problems or difficulties. She also confirmed that she used to have eye problems, but they went away. The claimant recalled that she had a staph infection in 2006, and also had cellulitis in the past, but they resolved. She wears inserts in her shoes. The claimant admitted that she did not use a cane when she was working. She last work in June, 2005, but has looked for work since then, perhaps performing office work or something sitting down. The claimant currently uses a cane that she got on or around March 9, 2007.[16] Upon discharge from the hospital for intravenous antibiotic treatment of her eczema, the claimant was instructed by her physician that due to her hip deformity, she should go to Wal-mart and get a cane.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

[Tr. 18 - 19 (record references omitted)].

Thus, the ALJ, as required, considered Plaintiff's allegations of disabling symptoms in order to "decide whether [s]he believe[d them]." *Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir. 1993) (quotation omitted). In making this determination, an ALJ should consider factors such as

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

---

[16]*See* Tr. 38.

*Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10ᵗʰ Cir. 1991) (quotation omitted).  In addition to her findings quoted above, the ALJ provided the following reasons for concluding that Plaintiff's complaints of *disabling* pain were not credible.

First, the ALJ concluded that Plaintiff "has over exaggerated her pain.  The claimant's description of the severity of the pain has been so extreme as to appear implausible." [Tr. 19].  Contrary to Plaintiff's claim that the ALJ "states no basis in fact for this finding[,]" [Doc. No. 21, p. 12], the ALJ found that Plaintiff's claim on the day of her hearing – that she had constant, sharp pain in her hip [Tr. 31 - 32] – was at odds with her decision on that day to forego her pain-alleviating medication [Tr. 32], Darvocet, because it made her drowsy [Tr. 40].[17]  The ALJ further found that Plaintiff indicated in her November, 2006 "Function Report - Adult" –  completed some seventeen months after her alleged date of onset when she claimed to be suffering from disabling symptoms[18] – that she was not taking medication at that time either.  *Id.*  Plaintiff argues that "[t]he ALJ cites a 2006 adult function report reflecting that the Claimant was not taking any prescription medication for her hip at that time.  TR 19.  Even though Claimant had been prescribed celebrex, lortab and Darcocet for

---

[17]The ALJ reacted to Plaintiff's demeanor at the hearing by asking if she had a cold, was nervous, or was afraid of the ALJ [Tr. 40].  When Plaintiff said that she was in pain, the ALJ – who advised that she had undergone hip replacements – asked why Plaintiff had not taken her medication if her pain was so great.  *Id.*

[18]There, Plaintiff stated that her condition caused her to be "constantly in pain." [Tr. 143].  She wrote that "[i]ts hard when all you do is lay in your bed."  *Id.*  And, as the ALJ found, Plaintiff stated that she was not taking any medications at that time [Tr. 144].

her pain." [Doc. No. 21, p. 12].   While Plaintiff's argument is not entirely clear, it appears

the ALJ's point was that it is implausible for Plaintiff to complain of intractable pain in her

November, 2006 function report but not to take pain medication to obtain some relief and

that such a decision by Plaintiff lessens the credibility of her claim of *disabling* pain.[19]

In connection with the ALJ's discussion of Plaintiff's failure to take pain medication

when she was allegedly suffering from constant, sharp pain, Plaintiff also takes issue [Doc.

No. 21, p. 12] with the ALJ's finding that the record indicates that the side effect of Darvocet

is mild and would not interfere with Plaintiff's ability to perform work activities [Tr. 19].

Plaintiff is correct; the undersigned has located nothing in the record about the side effects

---

[19]With regard to Plaintiff's statement in her brief that she was given Celebrex for pain, the record reflects that Plaintiff was seen at the O.U. Medical Center Orthopedic Surgery Clinic on October 9, 2006 [Tr. 243 - 244].  Her examination resulted in a plan for a month of physical therapy; she was given samples of Celebrex to take daily until her follow up appointment after the month of physical therapy.  Eight days later, Plaintiff submitted the following to the Social Security Administration:

> I can't believe it takes this long for any type of help.  I waited forever just to see an orthopedic specialist. I get there and they look at me like i'm crazy. They said that they will try me on a months worth of physical therapy.  They say i'm too young for a hip replacement.  So they want to try all other alternatives before they even look into surgery.  So, that is where i'm at now. Just waiting to see.  *They won't prescribe any pain medications* because they say I have to be near surgery. and that people become addicted to them.  So thats understandible.  Besides that I am in constant pain.  When I walk too long I tend to fall because my legs just gets weak.  I have throbbing shooting pains up and down my legs and my back.  I'm just waiting around on slow moving doctors to even help me in my situation.

[Tr. 139].  There is no evidence that Plaintiff returned to the Orthopedic Surgery Clinic until January, 2007 [Tr. 239 and 241 - 242].

of Darvocet. Nonetheless, this statement by the ALJ does not seriously undermine her core finding: Plaintiff's claim of disabling pain is less than credible in the face of her failure to take available medication to alleviate that pain.

Next, the ALJ found that while Plaintiff had sought medical treatment for her condition, her treatment had been routine and conservative [Tr. 19]. She further noted that none of Plaintiff's treating physicians imposed restrictions or limitations on her activities. *Id.* The undersigned's discussion of the medical evidence of record supports these findings by the ALJ. While the many physicians seen by Plaintiff both at the O.U. Medical Center and at various hospital emergency rooms reacted aggressively to her skin condition complaints, the reaction to her hip complaints was measured and without the imposition of restrictions. On several occasions, Plaintiff was advised that she could return to work after a few days off.

In connection with the additional evidence submitted to the Appeals Council, Plaintiff maintains that her hip replacement – a procedure that is neither routine nor conservative – "clearly corroborates her complaints of pain due to her hip deformity." [Doc. No. 21, p. 7]. Plaintiff, however, points to no evidentiary support for this conclusion. She did not submit any records of treatment immediately proceeding her surgery that described a disabling level of pain which necessitated the procedure but, instead, provided only two records showing the successful result [Tr. 314 - 318]. The ultimate decision to perform a hip replacement could have been guided by other concerns – the structural integrity of Plaintiff's hip, for example – rather than by the extent of Plaintiff's pain. Nothing in the record equates the need for a

hip replacement with a level of pain precluding all work activity, and to suggest otherwise is speculation. A review of the entirety of the evidence submitted to the Appeals Council [Tr. 5] actually supports the ALJ's credibility findings. Plaintiff's last treatment of record prior to her hip replacement in January, 2009 was on September 25, 2008, at the Deaconess Hospital Emergency Room when Plaintiff presented with the complaint of hip pain [Tr. 296 - 299]. The examining physician's assistant noted that while Plaintiff rated her pain at a 10/10, she appeared to be comfortable in her room, watching TV and eating a lunchables snack tray [Tr. 297]. On physical examination, he found no extremity tenderness and assessed a full range of motion in all extremities. *Id.* Such evidence supports the ALJ's conclusion that Plaintiff's "description of the severity of [her] pain has been so extreme as to appear implausible." [Tr. 19].

The ALJ further found that 'there is evidence from the consultative physician that the claimant was less than fully cooperative and put forth less than maximal effort during examination." *Id.* A review of the report of the consultative examiner confirms the ALJ's finding. The doctor found Plaintiff to be less than forthcoming when he was attempting to take her history [Tr. 212]; she denied the ability to manipulate small objects but was observed zipping her jacket [Tr. 213]; she stated that she could not grasp a hammer and could not hold a cup very well but, objectively, her grip strength was 5/5 and equal, *id.*; she would not even attempt to walk without a cane at the physician's request[20] [Tr. 214]; she tightened

_____

[20]The regulations regarding documentation of musculoskeletal impairments provide as follows:

her muscles when asked to relax them for purposes of an examination, *id.*; her neurological examinations were described as "very limited due to the patient's effort[,]"*id.*; and, "[t]here did appear to be some voluntary muscle movements, such as tightening muscles up so that I could not assess things very well and appeared to be a lack of effort." *Id.* Plaintiff takes issue [Doc. No. 21, p. 12] with the ALJ's conclusion based on the examiner's findings that "[i]t appears the claimant did so in an effort to exaggerate the extent of the findings in order to increase her chance of receiving benefits." [Tr. 19]. Plaintiff maintains that there is no evidence in the record to this effect [Doc. No. 21, p. 12]. The ALJ, however, did not state that the record showed this to be the case. Rather, she made clear that she was drawing a conclusion based on the objective and subjective findings of the examining physician. In any event, the ALJ's salient and well-supported finding was that Plaintiff purposefully did not allow the physician to verify the scope of her impairment and that such conduct casts doubt on the credibility of her subjective complaints with regard to that impairment.

---

> When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, examination should be with and without the use of the assistive device *unless contraindicated by the medical judgment of a physician who has treated or examined the individual.* The individual's ability to ambulate with and without the device provides information as to whether, or the extent to which, the individual is able to ambulate without assistance. The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented. The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 1.00J4 (emphasis added).

Next, the ALJ stated that Plaintiff last worked in June, 2005 and that there is no indication from her medical records that she was forced to stop working because of her hip impairment [Tr. 19]. The ALJ went on to say that "perhaps" – that is, to admittedly speculate – that Plaintiff stopped working due to pregnancy. Plaintiff objects to the speculation but fails to address the fact that there is no evidence that Plaintiff sought treatment for an allegedly disabling impairment until some ten months after she claims she became disabled [Tr. 251]. Likewise, the ALJ found [Tr. 20] both Plaintiff's application for placement in a work program and her testimony that she thought she could perform an office job [Tr. 37 - 38] to be at odds with her claim of *disabling* symptoms. While Plaintiff maintains on appeal that "[t]his is not evidence that the Claimant is not a credible witness[,]" [Doc. No. 21, p. 13], it plainly undercuts the claim in her "Function Report - Adult" that she must lie in her bed most of the day because of constant pain [Tr. 142 - 143].

Finally, the ALJ found the fact that Plaintiff goes out socially, visits with neighbors and friends, and lives with her three children, to be "inconsistent with a complete inability to work." [Tr. 20]. Plaintiff maintains that the record reflects that she does not go out socially and had not for some time and that "the ability to live to visit with a neighbor and live with your children is not evidence that an individual is capable of working eight hours a day, forty hours per week as the ALJ's decision intimates." [Doc. No. 21, p. 13]. Nonetheless, such evidence –particularly living as a single parent with three children, including a two year old, without around-the-clock help – supports the ALJ's overarching finding that Plaintiff's exaggerates her limitations.

The ALJ's conclusion – that Plaintiff's subjective complaints are not entirely credible – is well supported by substantial evidence.  An ALJ's "[f]indings as to credibility should be closely and affirmatively linked  to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). The ALJ properly and sufficiently explained the required link between the evidence of record and her finding that Plaintiff's allegations were not entirely credible.  And, as long as the ALJ provides the specific evidence she has relied on in assessing a claimant's credibility, "a formalistic factor-by-factor recitation of the evidence" is not required in the Tenth Circuit. *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000).  Plaintiff has failed to establish that the ALJ committed any error in connection with her assessment of Plaintiff's credibility.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be affirmed.  The parties are advised of their right to object to this Report and Recommendation by June 6th, 2011,  in accordance with 28 U.S.C. §636 and Fed. R. Civ. P. 72.  The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 16th day of May, 2011.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE